IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| SHARON PARTIDA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 06 C 4840 |
| vs. | ) | |
| | ) | Magistrate Judge Schenkier |
| MICHAEL J. ASTRUE, Commissioner | ) | |
| of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

The plaintiff, Sharon Partida, brings this action pursuant to 42 U.S.C. § 405(g) to review a final decision of the Commissioner of the Social Security Administration denying her Disability Insurance Benefits ("DIB") under the Social Security Act. Ms. Partida filed her application for disability benefits on September 16, 2004 (R. 21, 23), alleging that she became disabled on July 10, 2004, as the result of a seizure disorder (R. 29). Ms. Partida also alleged that she was disabled due to asthma and the fatigue her seizure medication causes her (R. 58-59, 204-05).

After her application was initially denied, Ms. Partida requested a hearing before an Administrative Law Judge ("ALJ") ( R. 35). Ms. Partida's hearing before the ALJ occurred on November 23, 2005; she appeared without counsel and signed a form to waive her right to representation (R. 199-200). Both Ms. Partida and a vocational expert ("VE"), Thomas Grzesik, testified at this hearing. The ALJ concluded that Ms. Partida was not disabled, based on his determination that plaintiff could perform other "light" work – namely jobs as a hand packager, mechanical assembler, or as a cashier – that exist in significant numbers in the national economy (R. 210). This became the final decision of the Commissioner on August 1, 2006, when the Appeals

Council denied plaintiff's request for review (R. 5-7). As a result, Ms. Partida's administrative remedies were exhausted (R. 5), and she filed her present complaint in the Northern District of Illinois on September 7, 2006.

Ms. Partida now seeks summary judgment reversing the Commissioner's decision denying her DIB or, in the alternative, remanding the case for further proceedings. The Commissioner has filed a cross-motion for summary judgment to affirm the decision. For the reasons stated below, the Court grants the Commissioner's motion for summary judgment (doc. # 26); the Court denies Ms. Partida's motion for summary judgment (doc. # 23).[1]

## I.

The Court will first discuss Ms. Partida's personal and then her medical history. Next, the Court will summarize the hearing testimony and the ALJ's written decision.

### A.

Ms. Partida was thirty-eight years old at the time of the ALJ's decision to deny her disability claim (R. 18). She has a husband and two daughters (R. 65-66, 70). Ms. Partida has a ninth grade education and is literate (R. 202, 212). She worked for the CTA as a bus driver from 1988 until July 2004 (R. 61). On July 10, 2004, Ms. Partida suffered an epileptic seizure which prevented her from further driving commercial vehicles (R. 29).

### B.

The relevant medical evidence pertaining to Ms. Partida's claims of disability based on seizure disorder and asthma is as follows. An electroencephalogram (EEG) performed on Ms.

---

[1]On March 5, 2007, by consent of the parties pursuant to 28 U.S.C. § 636(c), the Executive Committee reassigned this case to this Court for all proceedings, including entry of final judgment (doc. ## 18, 19).

Partida in February 2004 showed no electrographic seizures; and the results were "minimally abnormal, with rare slowing and sharp transient over the left frontal temporal area" (R. 106). Dr. Violeta Avramov, claimant's treating neurologist, reiterated these findings in March and April 2004 (R. 125-26). On July 10, 2004, Ms. Partida suffered the seizure which left her unable to continue in her past occupation as a bus driver (R. 29).

In October 2004, Dr. Avramov diagnosed Ms. Partida with a seizure disorder (R. 122). Dr. Avramov reported that claimant's seizures were well controlled by a twice daily dose of Keppra (R. 122). Dr. Avramov stated that Ms. Partida "may perform different jobs, except for: driving a commercial vehicle; operating heavy machinery; working on heights or other dangerous environments" (Id.).

In October 2004, Ms. Partida completed an Activities of Daily Living Questionnaire and Work History Report (R. 58-64). When prompted to list previous activities she no longer could perform, Ms. Partida indicated that she could neither drive nor jog (R. 60). She circled fatigue as a condition she experienced, and wrote that her seizure medication made her too dizzy and sleepy to sit for two hours or to climb stairs without stopping sometimes (R. 58-59). Ms. Partida stated that she needed rest periods twice a day when she took her medication (R. 59). In response to one of the inquiries on the questionnaire that asked her to describe any problems using her arms or hands, Ms. Partida did not describe any (R. 58).

In November 2004, Ms. Partida's husband, one of her daughters and her sister each filled out and signed a Seizure Description Form (R. 65-67). In March 2005, her other daughter filled out (but did not sign) the same form. These forms state that Ms. Partida has more than one seizure per month, that she loses awareness of her surroundings and stares blankly, and that she had hurt her lip

3

during a seizure (R. 65-67). Dr. Avramov examined Ms. Partida on November 30, 2004. Dr. Avramov reported that Ms. Partida did not suffer from tremors, was alert, and could walk normally (R. 119-121). She further reported that Ms. Partida's manual dexterity was normal (R. 121).

On January 14, 2005, a state medical consultant, Dr. Vincent Francis, filled out a Physical Residual Functional Capacity ("RFC") form for Ms. Partida (R. 92-99). Dr. Francis reported that Ms. Partida had no exertional limits stemming from her seizures (R. 93), and that her only postural limitation was that she could not "engage in the use of ladders, ropes, and scaffolds if seizure activity returns" (R. 94). Dr. Francis also found no limits on Ms. Partida's use of her arms and hands (R. 95). Dr. Francis stated that Ms. Partida should "avoid employment in an unprotected workplace," such as one with hazards of machinery and unprotected heights (R. 96). Dr. Francis stated that his findings concerning Ms. Partida's limitations or restrictions were consistent with those expressed by Dr. Avramov in her October 19, 2004 report, and that an RFC that recognized Ms. Partida's ability to perform different jobs – those without weight lifting restrictions, but that did not involve driving a commercial vehicle, operating heavy machinery, or working at heights or other dangerous environments – was appropriate (R. 98-99).

In February 2005, Dr. Avramov described Ms. Partida's seizures as occurring mostly at night during sleep, and stated that her medication would be changed because of "not good seizure control and side effects" (R. 104). Dr. Avramov stated that Ms. Partida could not perform the duties of her job as a driver, and that it was uncertain when Ms. Partida might be released to resume that job (*Id.*). However, Dr. Avramov also reported that Ms. Partida could perform all but heavy work, so long as

4

she was not required to drive, to be near moving machinery, or to be exposed to extreme temperatures or heights (R. 104-05).

Thereafter, in April 2005, Dr. Avramov noted fatigue and drowsiness as side effects of the anti-seizure medications (Keppra and Lamictal) claimant was prescribed (R. 114). Dr. Avramov did not describe those side effects as severe or limiting. On the contrary, when asked whether Ms. Partida could perform work related activities such as sitting, standing, moving about, lifting, carrying, handling objects, hearing, speaking and traveling, Dr. Avramov responded: "[Ms. Partida] can work/perform all duties . . . *except* for: (1) driving a bus or other commercial vehicle; (2) operating heavy machinery; (3) [exposure to unprotected] heights; and (4) [exposure to] extreme temperatures" (R. 115) (emphasis in original). On May 16, 2005, Dr. Avramov reported that Ms. Partida experienced no side effects from her medications (Keprra, Topamax, and Lonopin), which were taken at bedtime, save for being tired (R. 191).

On November 22, 2005, Dr. Nayana Dave wrote a letter stating that Ms. Partida was under her care for asthma (R. 132). Dr. Dave wrote that Ms. Partida's asthma had recently worsened due to changes in the weather, emotional upset, and stress (*Id.*). Dr. Dave also noted that "[Ms. Partida] is on disability due to her medical condition" (*Id.*). In further documentation from the consultation with Ms. Partida in November 2005, Dr. Dave noted that Ms. Partida "feels much better" since she started to take Prednisone for her asthma, and had expressed no other complaints to Dr. Dave (R. 158). Dr. Dave's notes also state that claimant "[n]eeds letter for Social Security disability" (R. 158; *see* also R. 159). Dr. Dave's progress notes state that Ms. Partida told her she got only $1,000 per month from disability and wanted a letter for a social security hearing for disability (R. 155).

On December 5, 2005, Ms. Partida participated in a pulmonary function study that "demonstrate[d] a mild obstructive defect with air trapping and hyperinflation" (R. 140). Ms. Partida showed a thirty-percent improvement in one-second forced expired volume after inhaling Albuterol (R. 140). The study noted that claimant's excellent response "would favor [a diagnosis of] asthma over other forms of airways obstruction" (R. 140).

In a progress note dated December 9, 2005, Dr. Dave reported that Ms. Partida's asthma was "stable" (R. 164). Dr. Dave further wrote that while she had done a disability form for Ms. Partida (the November 22, 2005 letter), the terms of any disability for Ms. Partida were to be determined by her neurologist – who was Dr. Avramov (*Id.*).

## C.

The relevant administrative hearing evidence is as follows. In his initial remarks, the ALJ observed that Ms. Partida was without counsel (R. 199). The ALJ reminded Ms. Partida of her right to representation, referencing the Notice of Hearing that claimant received prior to the hearing (R. 199). He also reiterated to Ms. Partida the availability of free legal assistance, or legal assistance on a contingency basis whereby "[attorneys] don't charge you any money at all unless they win your case, and only 25% of your past benefits if they do" (R. 199). With regard to the advantages of representation, the ALJ remarked, "[attorneys] can very often help you prepare your claim, and of course, they know the rules and regulations of Social Security, so they can often come to the hearing and their experience [sic] at appearing at the hearings, and they can help you with that as well" (R. 199).

The ALJ then asked Ms. Partida whether she wished to proceed without a lawyer or seek a continuance to pursue representation (R. 200). Ms. Partida's intial reply was inaudible, which led

6

to a cryptic exchange that culminated with the ALJ asking the claimant whether she was able to express herself (R. 200). Ms. Partida said that she could do so, and stated that "I'll go ahead with it [the hearing] today" (R. 200). The ALJ provided Ms. Partida with a form that she signed in order to execute her waiver of counsel (R. 200).

When the ALJ examined Ms. Partida, he inquired as to her level of education (R. 201). Ms. Partida stated that she had dropped out of high school in the tenth grade (R. 201-02), but she stressed that she led her children to believe she finished high school in an effort to keep them in school (R. 202-03). The record contains school transcripts that confirm that Ms. Partida only finished the 9th grade in high school, and did not receive a high school degree or GED (R. 189); but, there is also a transcript from Malcolm X College showing that Ms. Partida received three semesters of grades from the Fall of 1986 through the Fall of 1987 (R. 190).

The ALJ then questioned Ms. Partida regarding the medical evidence in the record. Ms. Partida told the ALJ that her insurance only allowed her to see one treating physician, Dr. Avramov, who treated her epilepsy (R. 203). However, the claimant also submitted medical records from Dr. Nayana Dave, who treated her asthma (R. 214).

Ms. Partida testified that she had suffered from asthma all her life, but the condition recently had worsened, due to stress, once she ceased working (R. 204-05). Ms. Partida stated that she had never been hospitalized or gone to an emergency room for her asthma (R. 204). At one point, the ALJ asked whether Ms. Partida was suffering an asthmatic attack during the hearing when the ALJ commented, "I notice you really hitting your pump there" (R. 203-04).

Ms. Partida also testified about her seizures. Claimant said that her seizures were not well controlled by her medication, and that was why Dr. Avramov prescribed her a new regimen at their

7

scheduled appointments every three months (R. 205-06). Ms. Partida claimed that she had been unable to seek a new career because her medication kept her "asleep all day" (R. 206). In turn, the ALJ asked claimant about her medications and elicited testimony that Ms. Partida's "main problem" was that she could not remain awake (R. 206-08). Ms. Partida indicated that, were it not for the difficulty she has staying awake, she could work in other capacities (R. 207-08).

The vocational expert (VE), Mr. Grzesik, testified that claimant's past work as a bus driver was "semi-skilled and light in physical demand" (R. 209). The ALJ asked the VE to assume that a person of Ms. Partida's age, education and work experience had an RFC for light work with the following limitations: "[t]hat she would avoid concentrated exposure to pulmonary irritants and that she would avoid exposure to hazards, such as unprotected heights, [and] dangerous machinery. She would not be able to operate commercial vehicles, and she would have to avoid dangerous environments" (R. 210). The VE said that with these limits, Ms. Partida could not perform her past work (*Id.*). The VE stated that there were other light duty jobs a person with these restrictions could perform: "Hand packager, of which there are approximately 4,500 jobs; mechanical assembler, 5,500 jobs; and cashier, 8,500 jobs" (*Id.*).[2]

---

[2]20 C.F.R. § 404.1567 Physical exertion requirements.

. . .

(b)   Light work.  Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weights lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.  To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities.  If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

8

The ALJ asked whether the VE's testimony that these were light duty jobs was consistent with the Dictionary of Occupational Titles (DOT) (R. 210). The VE explained that the DOT categorized hand packager as a heavy job, but that, in reality, the hand packager job encompassed a wide range of jobs including light work (*Id.*). The VE also clarified that the number of hand packager jobs he cited as available corresponded to the number of light work jobs available in the region (*Id.*).

The ALJ then asked whether Ms. Partida wished to ask the VE any questions, and added that the VE's testimony indicated she could work (R. 211). Ms. Partida asked: "Would they hire me?" (R. 211). It is not clear from the record whether Ms. Partida directed this question to the VE or the ALJ, but the ALJ answered: ". . . that actually is not a relevant discussion . . . . And so the question isn't whether someone would hire you. The question is whether if they did hire you, could you do the job?" (*Id.*). In response, Ms. Partida said she could do a job if trained (R. 211-13).

The ALJ then encouraged Ms. Partida to get her GED, but Ms. Partida said she first had to get her health in order (R. 212-13). Ms. Partida said "something [is] not right," since the doctor frequently changed her medication (R. 213). The ALJ then read a report from Dr. Avramov stating that Ms. Partida could work, and Mr. Partida responded that Dr. Avramov would not know anything about her asthma condition and that she had a note from her "primary doctor," Dr. Dave (R. 213-14). The ALJ then indicated he would get Dr. Dave's treating notes and proceed from there. The hearing ended at that point, without Ms. Partida stating that she wanted to ask the VE any further questions.

9

**D.**

In his written opinion denying Ms. Partida's claim, the ALJ began by assessing the degree of severity of Ms. Partida's seizure disorder and asthma (R. 15). He found these conditions to be "severe," but lacking in the requisite frequency to meet the requirements set forth in Listing 3.03 (asthma) or Listing 11.00 (neurological/epilepsy) (R. 15).

The ALJ reviewed the medical evidence as well as Ms. Partida's testimony about her condition and restrictions. The ALJ did not credit Ms. Partida's assertion that her medication made her too fatigued to work (R. 17). Characterizing her testimony as claiming to be "housebound," the ALJ noted that medical records did not support Ms. Partida's claim, that claimant was well-dressed and groomed, and that he suspected Ms. Partida of malingering due to inconsistencies in her demeanor at the hearing (R. 17). In particular, the ALJ noted that when Ms. Partida appeared to sense she might lose her case, she became upset, aroused and exhibited no drowsiness or fatigue (*Id.*).

The ALJ noted that the State Agency provided an RFC that was in line with the limitations Dr. Avramov expressed, but that neither assessment accounted for Ms. Partida's asthma. As a result, the ALJ added to the State Agency RFC – which limited Ms. Partida to work that did not involve operating commercial vehicles or heavy machinery, working at unprotected heights or other dangerous environments – two further limitations: light duty work, and absence of exposure to pulmonary irritants (R. 17, 19-20).

In reaching that finding, the ALJ discussed the statement by Dr. Dave that Ms. Partida was on disability due to her medical condition. The ALJ explained that the context of that statement was in reference to Ms. Partida's job as a bus driver, and did not speak to her ability to perform other

10

work (R. 17). The ALJ also noted that Dr. Dave's letter indicated her awareness of Ms. Partida's imminent home foreclosure and her need for money (*id.*) – perhaps suggesting that to the extent Dr. Dave's statement indicated that Ms. Partida could perform no other work, it was motivated by sympathy and not by an objective medical assessment.

Based on the RFC he found, the ALJ further found that Ms. Partida could not perform her past work as a bus driver, but that she could perform the hand packager, mechanical assembler and cashier jobs that the VE testified exist in significant numbers in the national economy (R. 18-19). The ALJ thus found that Ms. Partida was not disabled.

## II.

We begin the analysis with an overview of the relevant legal standards. Claimant has the statutory right to representation at a disability hearing. 42 U.S.C. § 406, 20 C.F.R. § 404.1700. Claimant also has the right to waive representation. *Binion v. Shalala,* 13 F.3d 243, 245 (7th Cir. 1994) (citing *Thompson v. Sullivan,* 933 F.2d 581, 584 (7th Cir. 1991)). The waiver is valid if the claimant is "given sufficient information to enable [her] to intelligently decide whether to retain counsel or proceed *pro se.*" *Thompson,* 933 F.3d at 584 (quoting *Hawwat v. Heckler,* 608 F. Supp. 106, 108 (N.D. Ill. 1984). Whenever the claimant lacks representation at a disability hearing, the ALJ bears a special duty to develop a full and fair hearing by probing for disabilities and uncovering all relevant medical evidence. *Binion,* 13 F.3d at 245. On review, a claimant who validly waives her right to counsel bears the burden to prove that the ALJ did not develop a full and fair hearing. *See id.* If the waiver as invalid, however, the burden rests with the Commissioner. *Id.*

To establish a "disability" under the Act, a claimant must show an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment

which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A)(2004). A claimant must demonstrate that his impairments prevent him from performing not only his past work, but also any other work that exists in significant numbers in the national economy. *See* 42 U.S.C. § 423(d)(2)(A). The social security regulations prescribe a sequential five-part test for determining whether a claimant is disabled. *See* 20 C.F.R. § 404.1520 (2004). Under this test, the ALJ must consider: (1) whether the claimant is presently unemployed; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the claimant's impairment meets or equals any impairment listed in the regulations as being so severe as to preclude substantial gainful activity; (4) whether the claimant is unable to perform her past relevant work; and (5) whether the claimant is unable to perform any other work existing in significant numbers in the national economy. *See* 20 C.F.R. § 404.1520; *see also Young v. Sec'y of Health & Human Services*, 957 F.2d 386, 389 (7th Cir. 1992).

A finding of disability requires an affirmative answer at either Step 3 or 5. A negative answer at any step other than 3 precludes a finding of disability. *Id.* The claimant bears the burden of proof at Steps 1 through 4, after which the burden of proof shifts to the Commissioner at Step 5. *Id.* In cases of severe impairment, the ALJ's analysis at Step 4 typically involves an evaluation of the claimant's residual functional capacity to perform the past relevant employment. *See* 20 C.F.R. § 404.1520(e); § 416.920(e). If a person can still do this kind of work, the Commissioner will find that the person is not disabled. *Id.* The Step 5 analysis involves an evaluation of the claimant's residual functional capacity to perform any other work that exists in significant numbers in the

12

national economy (other than the relevant past employment). *See Bowen v. Yuckert,* 482 U.S. 137, 142 (1987); 20 C.F.R. 404.1520(f); 416.920(f).

In reviewing the Commissioner's (here the ALJ's) decision, this Court may not decide facts anew, reweigh the evidence, or substitute its own judgment for that of the Commissioner. *Herron v. Shalala,* 19 F.3d 329, 333 (7th Cir. 1994). The Court must accept the findings of fact that are supported by "substantial evidence," 42 U.S.C. § 405(g)(2002), which is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Heron,* 19 F.3d at 333 (quotations omitted). Where conflicting evidence allows reasonable minds to differ, the responsibility for determining whether a claimant is disabled falls upon the Commissioner (or the ALJ), not the courts. *See Herr v. Sullivan,* 912 F.2d 178, 181 (7th Cir. 1990). *See also Stuckey v. Sullivan,* 881 F.2d 506, 509 (7th Cir. 1989) (the ALJ has the authority to assess medical evidence and give greater weight to that which the ALJ finds more credible). The Court is limited to determining whether the Commissioner's final decision is supported by substantial evidence and based upon proper legal criteria. *Ehrhart v. Sec'y of Health & Human Services,* 969 F.2d 534, 538 (7th Cir. 1992). A finding may be supported by substantial evidence even if a reviewing court might have reached a different conclusion. *See Delgado v. Bowen,* 782 F.2d 79, 83 (7th Cir. 1986) (per curium).

That said, the Commissioner (or ALJ) is not entitled to unlimited judicial deference. The ALJ must consider all relevant evidence, and may not select and discuss only that evidence which favors his or her ultimate conclusion. *See Herron,* 19 F.3d at 333. Although the ALJ need not evaluate in writing every piece of evidence in the record, the ALJ's analysis must be articulated at some minimal level and must state the reasons for accepting or rejecting "entire lines of evidence." *Id. See also Young,* 957 F.2d at 393 (ALJ must articulate reason for rejecting evidence "within

13

reasonable limits" if there is to be meaningful appellate review). The written decision must provide

a "logical bridge from the evidence to [the] conclusion" that allows the reviewing court a "glimpse

into the reasoning behind [the] decision to deny benefits." *See, e.g., Zurawski v. Halter,* 245 F.3d

881, 887, 889 (7th Cir. 2001) (quoting *Clifford v. Apfel,* 227 F.3d 863, 872 (7th Cir. 2000)).

### III.

Ms. Partida raises a number of issues. The Court finds that these issues largely can be

condensed into two main subject areas: (A) whether claimant's waiver of representation was valid,

and, if so, whether the ALJ failed his special duty to develop a full and fair hearing by not

sufficiently probing into plaintiff's circumstances to ensure that all relevant evidence was heard; and

(B) whether the ALJ erred in his RFC determination and finding at Step 5.[3]

### A.

Every claimant seeking social security benefits is entitled to representation at the

administrative hearing level. If a claimant wishes to pursue his or her claim unrepresented, she must

validly waive that right. The information necessary to ensure a valid waiver of counsel includes an

explanation of: (1) the manner in which an attorney can aid in the proceedings; (2) the possibility

of free counsel or a contingency arrangement; and (3) the limitation on attorneys' fees to 25 percent

of past due benefits and required court approval of attorneys' fees. *See Binion,* 13 F.3d at 245,

*Thompson v. Sullivan,* 933 F.2d at 584.

---

[3]In her reply memorandum, Ms. Partida also raises the argument that the ALJ erred at Step 3 by failing to find
that her conditions met or equaled a Listing (Reply Mem. at 9-11). However, that argument was not raised in Ms.
Partida's opening memorandum. As a result, that argument is waived. *See Kauther SDN BHD v. Sternberg,* 149 F.3d
659, 668 (7th Cir. 1998).

In this case, Ms. Partida only challenges the ALJ's compliance with the first of these three requirements. Although Ms. Partida admits that "[t]he ALJ did advise Ms. Partida that she had a right to an attorney who could help her prepare her claim, knew the rules and regulations of social security and was experienced in hearings[,]" she claims error because "the ALJ did not explain the manner in which the attorney could help and how the attorney could aid in the proceedings" (Pl.'s Reply at 1). According to Ms. Partida, "[t]his was important advice and could have helped her determine whether or not she needed an attorney. Without this knowledge, the waiver could not be knowingly and intelligently effected" (*Id.* at 1-2).

We disagree. The ALJ explained that an attorney could assist Ms. Partida not only with the preparation of her claim, but – given an attorney's experience and knowledge of the rules – also with the hearing of the claim. This is an accurate characterization of the role an attorney plays in disability hearings. On the basis of the ALJ's comments, Ms. Partida could weigh the benefits of proceeding immediately without the advantages of representation, or accepting a continuance to obtain those advantages. It is not required, nor is it possible, that the ALJ provide information sufficient for a claimant to measure with precision an attorney's possible impact on the outcome of his or her claim. The claimant, who has the burden of demonstrating invalidity, does not offer case law or other legal authority that requires such precision. And, this Court declines the invitation to impose that burden on the ALJ, who would then face the unsettling task of deciding which of the myriad attorney functions to include and which to exclude when informing claimants of the role of an attorney. Ms. Partida's waiver was valid; she therefore bears the burden to demonstrate that the ALJ failed to develop a full and fair record.

15

1.

When a claimant is unrepresented, an ALJ has a heightened duty to "scrupulously and conscientiously probe into, inquire of, and explore for all relevant facts," regardless of whether the waiver of counsel was valid. *See Nelson v. Apfel,* 131 F.3d 1228, 1235 (7th Cir. 1997). However, despite this heightened duty, courts "generally respect the [Commissioner's] reasoned judgment" on the subject of how much evidence to gather. *Luna v. Shalala,* 22 F.3d 687, 692 (7th Cir. 1994). A court will typically not remand based on a failure to develop the record unless there is a significant error resulting in prejudice to the claimant. *See Nelson,* 131 F.3d at 1235.

The Commissioner asserts that the ALJ fulfilled this duty by asking Ms. Partida questions about her vocational history, her alleged impairment and symptoms, her medication, her treatments and the impact her impairments had on her ability to perform various physical and mental activities. (Def.'s Mem. at 7, R. 202-209). Ms. Partida disagrees that the ALJ satisfied his duty to fairly develop the record. In particular, Ms. Partida points to an alleged failure to elicit: (1) testimony about her past work history as a CTA bus driver; and (2) testimony from the VE about how Ms. Partida's epilepsy medications and the side effects of drowsiness would affect her ability to work (Pl.'s Reply 2-4). Ms. Partida also challenges what she characterizes as the ALJ "succumbing to the desire to play vocational expert, " by advising Ms. Partida on what kinds of jobs and education she should and could get, but without asking the actual VE (or claimant) specific questions to lay the groundwork for such opinions (Pl.'s Reply at 4). We do not find any of these challenges persuasive.

We fail to see how Ms. Partida suffered prejudice for the development of her work record. To the extent Ms. Partida says the ALJ ignored that subject, she is mistaken. The ALJ elicited testimony that Ms. Partida worked as a CTA bus driver for 16 years, and had to give that job up due

16

to her epilepsy (R. 202). To the extent Ms. Partida says that this development was inadequate, she does not point out what of importance is missing. We note that the ALJ found that Ms. Partida could not perform her prior work. We are not persuaded that further development of Ms. Partida's work as a bus driver would have shed light on the work that the VE opined (and the ALJ found) she now can perform.

We likewise find no prejudice in the ALJ's failure to elicit testimony from the VE regarding Ms. Partida's ability to work if her epilepsy medications made her drowsy. The problem, asserts claimant, is that the VE never testified as to whether Ms. Partida could still perform the jobs identified by the VE (based on the ALJ's hypothetical) if she was so drowsy from her epilepsy medication that she could not stay awake to work. However, the ALJ found that Ms. Partida's testimony on that score was "not entirely credible due to the inconsistencies with the objective medical evidence and other reports" (R. 17). The ALJ also found Ms. Partida's claims of disabling drowsiness not credible based on the way she presented herself at the hearing. For example, the ALJ stated: ". . . . when she sensed that she was losng her case, she became upset, aroused and was very understandable in her speech with no signs of drowsiness or fatigue, which appeared to be an indication that she was malingering her symptoms to appear disabled" (R. 17).

An ALJ's credibility determination, based on personal observation as well as review of the medical evidence, cannot be overturned unless patently wrong. Here, we find no basis in the record to overturn the ALJ's credibility finding because we agree that the medical evidence does not support the extent of drowsiness claimed by Ms. Partida. None of the medical evidence indicates that Ms. Partida's reaction to the epilepsy medication is so pronounced that she must sleep (or is sleepy) for long stretches of the day. To the contrary, Dr. Avramov's reports repeatedly stated that Ms. Partida

17

was able to work (R. 122, 104-05, 115). The ALJ was not required to ask the VE a hypothetical based on a limitation – the inability to stay awake during the day – that he was entitled to find did not exist. Therefore, the ALJ's decision not to include drowsiness as a condition or limit on plaintiff's ability to work in his hypothetical to the VE was not a prejudicial error that violates the ALJ's duty to fully and fairly develop the record.

Finally, we do not interpret the ALJ's colloquy with Ms. Partida about getting her GED and finding other work (R. 212-13) as "playing vocational expert." The ALJ did not expand the available jobs identified by the VE, either in type or number. The colloquy was initiated when Ms. Partida, upon being invited to question the VE, asked if anyone would hire her for the jobs the VE identified (R. 211). The ALJ explained that this was not a relevant inquiry, and that instead the question is whether she could perform the jobs identified by the VE if hired (*Id.*). Ms. Partida said she could do so if trained (R. 212). The ALJ's opinion does not indicate that he relied on this statement by Ms. Partida in reaching his decision. We find no reversible error on this point.

**B.**

We next move to the second challenge by Ms. Partida to the ALJ's decision denying benefits: whether the ALJ lacked substantial evidence for his RFC determination and finding of non-disabled at Step 5. Ms. Partida contends that the ALJ's RFC failed to give enough weight to claimant's (1) asthma, (2) drowsiness from prescribed medication, and (3) hand twitching (Pl.'s Mem. at 9).

We can dispense quickly with two of these three points. Claimant's briefs, and the record itself, make very little of Ms. Partida's alleged hand-twitching (*See* Pl.'s Mem. at 8; R. 143-44). Nor is there any medical evidence that cites hand-twitching as a serious problem. On the contrary, a November 2004 neurological report stated that Ms. Partida exhibited normal manual dexterity with

18

no limitations (R. 121), and an October 2004 report characterized her seizures as well controlled (R. 122). In a self-assessment of her condition, Ms. Partida failed to describe any problems using her hands or arms, even though the form invited her to do so (R. 58). Finally, the state examiner's report stated there were no limits on Ms. Partida's ability to use her arms and hands (R. 95). On this record, there was no reason for the ALJ to give hand-twitching special consideration as a limitation on Ms. Partida's RFC. And, for plaintiff's asthma, the ALJ explicitly informed claimant at the hearing the he believed she had asthma, and in his findings the ALJ adjusted the RFC to reflect that she should not be exposed to pulmonary irritants (R. 213; *see also* R. 19-20 (Finding No. 6)). Thus, the ALJ did take asthma into account in determining claimant's RFC.

We now turn to plaintiff's claim that the ALJ's determination to exclude fatigue or drowsiness as a limiting factor in the claimant's RFC was the kind of error warranting reversal or remand at Step 5. We conclude that it is not. To be sure, there is evidence that Ms. Partida experienced drowsiness as a result of the medication. Not only did Ms. Partida identify it the "Daily Living Questionnaire," but she also submitted to the SSA progress notes from Dr. Dave, her primary physician, which noted that Ms. Partida complained of drowsiness and sleepiness (R. 102-05). Dr. Avromov's appointment notes in February and April 2005 also indicate that Ms. Partida reported being drowsy on the epilepsy medications (R. 191). And, at the hearing, Ms. Partida discussed her drowsiness and said that it prevented her from working or continuing her education, because it made her sleep all day (R. 206-08).

However, the record contains substantial evidence to support the ALJ's rejection of drowsiness as a limiting factor. The ALJ did not find the claimant entirely credible in her testimony about drowsiness, and as we have explained above, at credibility determination was not clearly

19

erroneous. Moreover, neither Dr. Dave, Dr. Avramov, nor Dr. Francis expressed the view that claimant's drowsiness precluded her ability to work. Indeed, the ALJ explained to Ms. Partida that he rejected the claim of incapacitating drowsiness on the basis of reports filled out by Dr. Avramov (R. 213), which stated: "Sharon has a seizure disorder. She is on an anti-seizure medication called Keppra. The dose is 1000 mg twice daily. Her seizures are well-controlled on it. Sharon may perform different jobs except for driving a commercial vehicle, operating heavy machinery, working on [sic] heights and other dangerous environments" (R. 213).

Since Dr. Avramov noted claimant's drowsiness several times but considered claimant still able to work within given limitations, we believe that the ALJ did not completely ignore the drowsiness evidence but rather incorporated it by adopting Dr. Avramov's findings as to claimant's RFC. *See Skarbek v. Barnhart,* 390 F.3d 500, 504 (7th Cir. 2004) (court satisfied that claimant's obesity "was factored indirectly into the ALJ's decision as part of the doctors' opinions"). Thus, the objective medical evidence supports the ALJ's decision to exclude drowsiness as a non-exertional limitation on the claimant's RFC.

## IV.

Finally, there are several remaining issues raised by plaintiff with respect to the ALJ's Step 5 finding that we briefly address.

## A.

Plaintiff contends that the VE's testimony about the types of jobs Ms. Partida could perform was inconsistent with the Dictionary of Occupational Titles ("DOT") definitions for those jobs (Pl.'s Mem. at 9-12). According to plaintiff, SSR 00-4p "clarifies the standards for the use of vocational experts, and discusses the circumstances when the occupational evidence provided by a VE is not

20

consistent with the D.O.T." (Pl.'s Mem. at 11). The claimant further argues that SSR 00-4p states that when there is an apparent unresolved conflict between testimony of the VE and the DOT, the ALJ is required to elicit a reasonable explanation for the conflict before relying on the VE's testimony. As part of the ALJ's duty to develop a full and fair record, the Ruling explains that the ALJ has a duty to explain the conflict and how it was resolved, since neither the DOT nor the vocational expert testimony trumps the other where there is a conflict (Pl.'s Mem. at 11).

We reject Ms. Partida's argument for several reasons. *First*, the ALJ specifically questioned the VE about a facial conflict between the DOT and the VE's testimony. In response, the VE explained that while DOT characterizes hand packager jobs as heavy exertional works, "in reality [those jobs] exist across all exertional levels, sedentary, light and medium, heavy and very heavy" (R. 210). The VE then clarified that the number of hand packager jobs he cited " are the number the light jobs that exist in the region" (*Id.*). Thus, the ALJ fulfilled his duty to develop the record, explain any evident conflict, and explain how it was resolved.

*Second*, Ms. Partida admits (by failing to contest it) that 8,500 the cashier jobs identified by the VE (R. 210) fall into the light work exertional category. Thus, even if she could not perform the hand packager and mechanical assembler jobs identified by the VE, she would still have the exertional RFC to perform the cashier jobs, which exist in sufficient numbers to find at Step 5 that plaintiff is not disabled. Ms. Partida argues she cannot perform that "many" cashier jobs because they have a high skill level requirement, and/or are located in places with environmental restrictions (Pl.'s Mem. at 10-11). Ms. Partida claims that there is no way to tease out how many of the 8,500 cashier jobs available in the national economy she could perform given her lack of skill and environmental restrictions. However, the ALJ's hypothetical posited a person with Ms. Partida's

21

education (ninth grade, but literate (R. 212) – as she had to be to pass the examination to obtain a license to drive buses for the CTA) and environmental restrictions (no concentrated exposure to pulmonary irritants) (R. 209-10). It was in response to that hypothetical that the VE said 8,500 cashier jobs were available (R. 210). Thus, the VE's testimony incorporated the considerations Ms. Partida now claims are missing.

## B.

Ms. Partida claims that the "most glaring error in the ALJ's analysis of claimant" is his "misstated" explanation of claimant's testimony and "educational accomplishments (Pl.'s Mem. at 12). We find no error here that requires remands.

The ALJ's opinion described Mr. Partida as having "more than a high school education." (R. 18). That statement was in error, based on her testimony that she dropped out after ninth grade (R. 202). This error may have resulted from a document submitted in support of her claim that she had some college education (R. 190) – apparently a fiction Ms. Partida used to keep her daughters from knowing she didn't finish high school (R. 202). In any event, we fail to see what prejudice resulted from this error. The VE heard the true testimony about Ms. Partida's education, the VE based his testimony about available work on the evidence of Ms. Partida's education that he heard at the hearing, and it is that testimony upon which the ALJ relied.

As for the alleged "misstatement" of testimony, Ms. Partida complains that the ALJ's use of the words "housebound" and "heavily sedated" are not consistent with her testimony. We disagree. The claimant herself testified that after she takes her asthma and epileptic seizure medications, she is asleep all day. We recognize that this does not literally mean that Ms. Partida sleeps around the clock. *See Mendez v. Barnhart*, 439 F.3d 360, 303 (explaining that this kind of testimony means that

22

a claimant "is abnormally sleepy and listless and dozes off frequently"). That said, Ms. Partida explained that she cannot stay awake long enough to perform any work, due to the medications the takes (R. 206). She further explained that she could not get to work on time because she would be "in bed" (R. 208). From this, the ALJ could fairly state that plaintiff claimed that her stated need "to sleep all day" rendered her "housebound." We find no reversible error in the ALJ's use of these terms.

### C.

Claimant also appears to argue that the ALJ improperly rejected the opinion of Dr. Dave because Ms. Partida told Dr. Dave that she could not live on the $1,000 disability check she received each month (which arguably might lead Dr. Dave, out of sympathy, to stretch and issue an opinion that would help Ms. Partida receive SSI benefits). We do not discount that this factor may have played a role in the ALJ's assessment. But, beyond that, the ALJ expressly found Dr. Dave's statement that Ms. Partida was on disability to be less of an assessment and more a description of why she could not work for the CTA. The ALJ rejected the opinion only insofar as Dr. Dave was surmising that Ms. Partida was on disability "due to her medical condition." The ALJ rejected this broad statement, but said that he agreed that claimant could no longer drive a bus due to her seizure condition. Interpreted in this more narrow way, the ALJ found Dr. Dave's assessment to be consistent with Dr. Avramov's assessment. That interpretation was reasonable; we thus find no error here.

### D.

Claimant raises the issue of whether the ALJ's Step 5 finding was erroneous because the ALJ failed to do a "function by function" assessment as required by SSR 96-8p with regard to Ms.

Partida's RFC. SSR 96-8p requires that the RFC assessment "include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (*e.g.*, laboratory findings) and nonmedical evidence (*e.g.*, daily activities, observation)." The ALJ must consider all exertional and non-exertional factors when making this determination, by considering each function separately so as to ensure that the person can perform work on a regular and continued basis. The RFC must also resolve all inconsistencies in the evidence.

Claimant asserts that the ALJ "did not articulate what claimant could do or could not do based on documents in the evidence, but merely sought to arrive at a conclusion based on the vague assertions by Dr. Avramov that claimant could do 'all other types of work'" (Pl.'s Reply at 7). That assertion fails to give due credit to the ALJ's analysis, and to the record as a whole.

The ALJ explained why he found credible not only Dr. Avramov's consistent statements that Ms. Partida could work (with limitations), but also the opinion of the state examiner (R. 17). He explained both why those limitations did not need to include factoring for drowsiness, and why the limitations should be expanded to account for Ms. Partida's asthma (*Id.*). The ALJ explained why Dr. Dave's statement that Ms. Partida was on disability due to her medical condition was reasonably interpreted as a statement of why she no longer could be a bus driver and not as a statement that she could do no other work. We do not find fault with that interpretation. On this analysis, we conclude that the ALJ complied with SSR96-8P.

24

## CONCLUSION

For the foregoing reasons, the Court directs the clerk of the Court to grant defendant's motion for summary judgment (doc. # 26) and deny plaintiff's motion for summary judgment (doc. # 23).

ENTER:

SIDNEY I. SCHENKIER
**United States Magistrate Judge**

**Dated: October 16, 2007**